UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 1 9 2018

ATG Capital LLC, *et al.*,

      Plaintiffs,

—v—

MGT Capital Investments, Inc., *et al.*,

      Defendants.

17 Civ. 2440 (AJN)

MEMORANDUM OPINION &
ORDER

ALISON J. NATHAN, District Judge:

This case arises from Plaintiffs' decision to provide financing to two companies with the expectation that Defendant MGT Capital Investments, Inc. ("MGT") would acquire those companies and that Plaintiffs would receive stock in MGT when it did so, and MGT's subsequent failure to close the acquisitions. Plaintiffs allege that Defendants tortiously interfered with Plaintiffs' contracts with the target companies; that MGT breached its own contract with one of those companies, a contract of which Plaintiffs were intended third-party beneficiaries; and that Defendants unjustly enriched themselves at Plaintiffs' expense. Defendants have moved to dismiss Plaintiffs' amended complaint. Oral argument is unnecessary, and for the reasons below, the motion to dismiss is GRANTED in part and DENIED in part.

## I.    BACKGROUND

The Court takes the following facts from Plaintiffs' amended complaint and from the contracts at issue in this case. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (explaining that a complaint includes any statements or documents

incorporated in it by reference and that even when a plaintiff does not attach to the complaint or incorporate by reference a document "'upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment" (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

Around October 8, 2015, Plaintiffs invested in MGT. Complaint[1] at ¶ 16. In April 2016, John O'Rourke, the managing member of ATG Capital LLC, introduced Robert Ladd, MGT's founder and CEO at the time, to John McAfee, the creator of an antivirus software that bears his name. Complaint at ¶ 17. They, along with their advisors, agreed that MGT would rebrand itself as a cybersecurity company, which McAfee would lead. Complaint at ¶ 17. They decided that McAfee would become MGT's Chairman and CEO, and that MGT would then acquire an anti-spyware technology owned by D-Vasive, Inc. ("D-Vasive"). Complaint at ¶¶ 18-19.

To support D-Vasive's operations while it awaited acquisition by MGT, McAfee and Ladd requested a loan of $100,000 to D-Vasive. Complaint at ¶ 20. In May 2016, sixteen investors, including the seven Plaintiffs here, provided financing to D-Vasive by purchasing convertible promissory notes from the company. Complaint at ¶ 20. The investors also entered into a Securities Purchase Agreement with D-Vasive. *See* Complaint at ¶ 21; Dkt. No. 61, Ex. C-1 (D-Vasive SPA). The D-Vasive Note Agreement provided that D-Vasive was required to pay back the investment at the earlier of six months from the date of issue or when repayment was demanded. Dkt. No. 61, Ex. B-1 (D-Vasive Note) at 1. Pursuant to the Note Agreement's

---

[1] "Complaint" refers to the Amended Complaint filed on June 26, 2017. *See* Dkt. No. 54.

"Voluntary Conversion" provision, the investors could elect to convert their notes into 8,800,000 shares of D-Vasive common stock, divided among the investors on a pro rata basis according to their relative contributions. Complaint at ¶ 22. Alternatively, pursuant to the Note Agreement's "Mandatory Conversion" provision, if all shares of D-Vasive's capital stock were acquired or if substantially all of the assets of D-Vasive were purchased, the amounts due under the Note would be converted to common stock of the acquiring company. Complaint at ¶ 22; *see also* D-Vasive Note at § 4(d) (stating that if D-Vasive "effects a transaction whereby either (i) 100% of the issued and outstanding shares of capital stock of [D-Vasive] are acquired, or, (ii), substantially all of the assets of [D-Vasive] are acquired, in exchange for shares of capital stock of an acquiring corporation . . . then all amounts due and owing under this Note shall be deemed converted to common stock of [D-Vasive]"); D-Vasive Note at § 5(c) ("Upon the occurrence of any such Fundamental Transaction," like D-Vasive's acquisition, "the Successor Entity shall succeed to, and be substituted for . . . and may exercise every right and power of [D-Vasive] and shall assume all of the obligations of [D-Vasive] under this Note . . . as if such Successor Entity had been named as [D-Vasive] herein.").

Plaintiffs agreed to provide the financing to D-Vasive because they expected that they would receive shares of MGT common stock upon MGT's acquisition of D-Vasive. Complaint at ¶¶ 20-21. Indeed, Plaintiffs deposited the funds in an escrow account, and they were released to D-Vasive only when it entered an asset purchase agreement with MGT. Complaint at ¶ 20.

On May 9, 2016, MGT and D-Vasive executed an Asset Purchase Agreement ("D-Vasive APA") for MGT to acquire the D-Vasive technology. Complaint at ¶ 23. Under the D-Vasive APA, "in consideration for the sale, transfer, assignment, conveyance and delivery by D-Vasive

to [MGT] of [its] Assets," MGT agreed to (i) pay $300,000 to D-Vasive; (ii) issue to D-Vasive or D-Vasive's designees and deliver to an escrow agent 4,760,000 unregistered shares of Common Stock; and (iii) issue and deliver to D-Vasive or D-Vasive's designees 19,048,000 unregistered shares of Common Stock. Dkt. No. 59, Ex. D (D-Vasive APA) at § 2.4. The D-Vasive APA also specified that "Holders of D-Vasive, Inc. Convertible Notes" would receive 8,800,000 shares of MGT common stock at closing. D-Vasive APA, Annex A.

In addition, the D-Vasive APA contained a "No Third Party Beneficiaries" provision, which stated that "no provision of this Agreement shall be deemed to confer upon any other Third Parties any remedy, claim, liability, reimbursement, cause of action or other right; provided however, [MGT] understand[s] and agree[s] that D-Vasive's designees shall have a right to receive the Common Shares constituting the Purchase Price." D-Vasive APA § 8.11.

After the execution of the D-Vasive APA, McAfee proposed that MGT also acquire another company, Demonsaw, LLC ("Demonsaw"). Complaint at ¶ 25. Once again, Plaintiffs provided financing to support the company until MGT could acquire it. Complaint at ¶ 26. Plaintiffs, along with one other investor, entered a Securities Purchase Agreement with Demonsaw and purchased promissory notes from the company that were convertible into 10,000,000 shares of Demonsaw, divided among the investors on a pro rata basis according to their contributions. Complaint at ¶¶ 26-27. Like the D-Vasive Note Agreement, the Demonsaw Note Agreement provided for mandatory conversion of the loans into equity upon MGT's acquisition of Demonsaw. Complaint at ¶ 27. The Demonsaw Note Agreement also required Demonsaw to pay back the investment at the earlier of six months from the date of issue or when repayment was demanded. Dkt. No. 59, Ex. G (Demonsaw Note) at 1. As with the D-Vasive

4

funds, the Demonsaw funds were released from escrow only when MGT and Demonsaw executed an asset purchase agreement. Complaint at ¶ 29.

On May 26, 2016, MGT and Demonsaw entered an Asset Purchase Agreement ("Demonsaw APA"). Complaint at ¶ 28. Under the Demonsaw APA, "in consideration for the sale, transfer, assignment, conveyance and delivery by Demonsaw to [MGT] of [its] Assets," MGT agreed to (i) issue to Demonsaw or its designees and deliver to an escrow agent 4,000,000 unregistered shares of Common Stock; and (ii) issue and deliver to Demonsaw or Demonsaw's designees 16,000,000 unregistered shares of Common Stock. Dkt. No. 61, Ex. F-1 (Demonsaw APA) at § 2.4. The Demonsaw APA also contained a "No Third Party Beneficiaries" provision substantially similar to that in the D-Vasive APA. Demonsaw APA § 8.11.

In May 2016 filings with the Securities and Exchange Commission, MGT informed its shareholders of the anticipated D-Vasive and Demonsaw acquisitions and of the plan for McAfee to become MGT's Chairman and CEO. Complaint at ¶ 30. After the filings, MGT's stock price increased significantly. Complaint at ¶ 30. Ladd then sold his shares in MGT, obtaining significant proceeds. Complaint at ¶ 31.

In June 2016, McAfee arranged for Defendant Nolan Bushnell to be appointed to MGT's board as an independent director. Complaint at ¶ 33. As a result of their service on the board, Bushnell, along with Defendants Robert Holmes and Michael Onghai, owned stock in MGT. Complaint at ¶ 33.

In July 2016, MGT arranged for D-Vasive to acquire Demonsaw. Complaint at ¶ 34 n.1. The D-Vasive APA was amended to reflect that acquisition, and it explicitly provided that "Holders of Demonsaw, LLC Convertible Notes" would receive 10,000,000 closing shares and

"Holders of D-Vasive Inc. Convertible Notes" would receive 8,800,000 closing shares. Complaint at ¶ 34 n.1; Dkt. No. 59, Ex. J (Amendment to D-Vasive APA), Annex A.

On September 9, 2016, MGT's shareholders approved the acquisition of D-Vasive/Demonsaw and the appointment of McAfee as Chairman and CEO. Complaint at ¶ 35. MGT refused to close the D-Vasive/Demonsaw acquisition, but MGT "publicly proceeded as if the acquisitions had been completed." Complaint at ¶¶ 35-36.

On October 13, 2016, O'Rourke and note purchaser Barry Honig met with McAfee, who informed them that unless Plaintiffs invested an additional $11,655,000 in MGT, MGT would not close the D-Vasive/Demonsaw acquisition. Complaint at ¶ 38. After Plaintiffs refused to provide those additional funds, Ladd approached John Stetson, managing member of note purchaser Stetson Capital Management, LLC, in November 2016 and proposed that Plaintiffs pay MGT $3,750,000 in exchange for MGT closing the D-Vasive/Demonsaw acquisition. Complaint at ¶¶ 43-44. Plaintiffs again refused. Complaint at ¶ 44. On January 25, 2017, Honig and Mark Groussman, President of note purchaser Melechdavid Inc., met with Ladd, who this time asked Plaintiffs to pay $3,000,000 in exchange for MGT closing the acquisition. Complaint at ¶ 46. Once again, Plaintiffs refused. Complaint at ¶ 46.

On March 3, 2017, MGT announced that it had acquired a 46% equity interest in Demonsaw but did not announce a similar deal with D-Vasive. Complaint at ¶¶ 47-48.

Plaintiffs have not received anything in exchange for the money that they invested in MGT. Complaint at ¶ 50.

On April 4, 2017, Plaintiffs ATG Capital LLC; Four Kids Investment Fund LLC; GRQ Consultants Inc. 401k FBO Barry Honig; Barry Honig; Jonathan Honig; Melechdavid Inc.; and

Stetson Capital Management LLC filed suit against Defendants MGT, John McAfee, Robert Ladd, Nolan Bushnell, Robert Holmes, and Michael Onghai. Dkt. No. 1. Defendants filed a motion to dismiss the complaint on June 5, 2017. Dkt. No. 47. In response, Plaintiffs filed an amended complaint, asserting claims of (1) tortious interference with contractual relations against all defendants; (2) breach of contract by MGT; and (3) unjust enrichment against all defendants. Dkt. No. 54. Because Plaintiffs filed an amended complaint, Defendants' motion to dismiss Plaintiffs' original complaint, Dkt. No. 47, is denied as moot.

On July 24, 2017, Defendants filed a motion to dismiss Plaintiff's amended complaint. Dkt. No. 57. For the reasons below, that motion to dismiss is granted in part and denied in part.

## II. LEGAL STANDARD

### A. Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). To survive a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

### B. Governing Law

New York law governs the D-Vasive and Demonsaw APAs, D-Vasive APA § 8.5; Demonsaw APA § 8.5, as well as the D-Vasive and Demonsaw Note Agreements, D-Vasive Note § 8(d); Demonsaw Note § 9(d); D-Vasive SPA § 5.8; Demonsaw SPA § 5.8.

## III. TORTIOUS INTERFERENCE WITH CONTRACT

### A. Breach of Contract

Plaintiffs claim that Defendants caused D-Vasive and Demonsaw to breach the Note Agreements with Plaintiffs by refusing to close MGT's acquisition of D-Vasive/Demonsaw. Complaint at ¶ 56. Defendants argue that Plaintiffs' claim fails because Plaintiffs have not alleged an actual breach of either Note Agreement. Dkt. No. 58 (Def. Memo) at 11.

"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996).

Here, Plaintiffs have not alleged D-Vasive's or Demonsaw's breach of its contract with Plaintiffs as a result of its failure to convert Plaintiffs' debt into stock. According to the complaint, "A Note Agreement exists between Plaintiffs and D-Vasive, pursuant to which D-Vasive is to convert all amounts owed under the notes between Plaintiffs and D-Vasive into common stock *upon D-Vasive's acquisition*." Complaint at ¶ 53 (emphasis added). Plaintiffs make the same allegation regarding the Note Agreement with Demonsaw. Complaint at ¶ 54. However, Defendants "refuse[d] to close the MGT/D-Vasive and MGT/Demonsaw

acquisitions," Complaint at ¶ 56, so D-Vasive and Demonsaw were not acquired by MGT. Because D-Vasive's and Demonsaw's obligations to convert Plaintiffs' debt into stock were conditioned upon acquisition by MGT, but neither company was acquired, D-Vasive and Demonsaw did not breach their obligations to Plaintiffs by failing to convert the debt into stock.

However, in their opposition to the motion to dismiss, Plaintiffs allege a slightly different theory of D-Vasive's and Demonsaw's breaches. They emphasize that D-Vasive and Demonsaw breached the Note Agreements by failing to repay the Notes, which came due in November 2016. Dkt. No. 60 (Pl. Memo) at 6-7 & n.5.

Nevertheless, assuming arguendo that the complaint sufficiently alleges that D-Vasive and Demonsaw breached the Note Agreements by failing to repay the notes, Plaintiffs have not alleged that Defendants intentionally procured that breach. Although in their opposition to the motion to dismiss Plaintiffs insist that MGT "effectively controlled both D-Vasive and Demonsaw and prevented them from repaying on maturity," Pl. Memo at 6, the complaint does not make that claim. The complaint states that Plaintiffs "have not seen a single penny" in exchange for their investments, Complaint at ¶ 50, but does not allege that Defendants prevented D-Vasive and Demonsaw from repaying the notes. Instead, Plaintiffs claim, "Defendants have intentionally caused D-Vasive and Demonsaw to breach their Note Agreements with Plaintiffs by refusing to close the MGT/D-Vasive and MGT/Demonsaw acquisitions, thus preventing D-Vasive and Demonsaw from converting the amounts owed under the D-Vasive and Demonsaw Notes into stock. . . . Plaintiffs were deprived of the value of the 5.75 million shares of MGT they should have received as a result of the D-Vasive acquisition and the value of the 8 million shares of MGT they should have received as a result of the Demonsaw acquisition." Complaint

at ¶¶ 56, 59. The complaint thus alleges that Defendants caused D-Vasive's and Demonsaw's failure to convert the amounts owed under the notes into stock; it does not allege that Defendants caused D-Vasive's and Demonsaw's failure to repay the notes. And as previously explained, the obligations of D-Vasive and Demonsaw to convert Plaintiffs' debt into stock was conditioned upon the companies' acquisition by MGT, a condition that was not satisfied.

Accordingly, Plaintiffs' claim that Defendants tortiously interfered with Plaintiffs' contracts by causing D-Vasive and Demonsaw to breach their Note Agreements fails.

### B. Impossibility of Performance

Plaintiffs also allege that Defendants committed tortious interference by "frustrat[ing] D-Vasive and Demonsaw's performance under the Note Agreements, and/or render[ing] such performance impossible." Complaint at ¶ 57. In response, Defendants contend that a claim of tortious interference with contract can succeed only if the contract at issue was actually breached, not if the defendant frustrated performance under the contract. Def. Memo at 10 n.10.

Although Plaintiffs dispute Defendants' contention, Pl. Memo at 8-9, the Court concludes that New York law does not recognize a tortious interference with contract claim if the contract at issue was not actually breached, *see Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir. 1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of breach of a contract without proving that the underlying contract has been breached."); *NBT Bancorp v. Fleet/Northstar Fin. Grp.*, 664 N.E.2d 492, 495 (N.Y. 1996) ("NBT urges that, as a matter of precedent and policy, a defendant's deliberate indifference with plaintiff's contractual rights that causes damages should be punishable as tortious interference whether or not the contract was actually breached. New York law is to the contrary."); *see also*

*Samsung Display Co., Ltd. v. Acacia Research Corp.*, No. 14-CV-1353 (JPO), 2014 WL 6791603, at * 4 (S.D.N.Y. Dec. 3, 2014) (explaining that the argument that it is enough, for a tortious interference claim, to allege that the defendant's interference made the contract impossible to perform, or that that the defendant induced the third party to render performance impossible "is directly at odds with controlling law. New York law is clear: nothing short of actual breach gives rise to a claim for tortious interference with contractual relations."); *Marzullo v. Beekman Campanile, Inc.*, No. 10 Civ. 0364(PGG), 2011 WL 3251507, at *3 (S.D.N.Y. July 22, 2011) (analyzing cases and concluding that "a tortious interference with contract claim may not be premised on a theory that the defendant committed an act that rendered performance of a contract impossible"); *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 481 (S.D.N.Y. 1997) ("The court adheres to the rulings of New York's highest state court as well as those of the Second Circuit and holds that in order to establish a claim under the tort of interference with contractual relations, a third party must breach the contract after being induced to do so by the defendant.").

Accordingly, Plaintiffs' theory that Defendants rendered D-Vasive and Demonsaw's performance impossible cannot serve as a basis for Plaintiffs' tortious interference claim. The motion to dismiss Plaintiffs' tortious interference with contractual relations claim is granted.

## IV.    THIRD-PARTY BENEFICIARY BREACH OF CONTRACT

Plaintiffs claim that they are third-party beneficiaries of the D-Vasive APA and that MGT breached its obligations under the APA by failing to close the D-Vasive acquisition.[2]

---

[2] In this section, the Court refers exclusively to the D-Vasive APA and the D-Vasive acquisition because, as Plaintiffs explain, "MGT originally sought to acquire D-Vasive and Demonsaw separately but restructured the deal in July 2016 to acquire both in one fell swoop. The

Complaint at ¶¶ 61, 63. Defendants contend that Plaintiffs have no standing to bring a third-party beneficiary claim because the D-Vasive APA expressly negates the intent to confer upon third parties the right to enforce the contract. Defendants' Memo at 15. Defendants further assert that Plaintiffs' third-party breach of contract claim must be dismissed because there was no underlying breach of the D-Vasive APA by MGT. Defendants' Memo at 16-17.

To establish a breach of contract as a third-party beneficiary, a plaintiff must demonstrate: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [its] benefit, and (3) that the benefit to [it] is sufficiently immediate . . . to indicate the assumption by the contracting parties of a duty to compensate [it] if the benefit is lost." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (alterations in original) (quoting *Mendel v. Henry Phipps Plaza W., Inc.*, 844 N.E.2d 748, 751 (N.Y. 2006)). The contract must clearly demonstrate an intent to permit third-party enforcement of the contract. *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 528 (2d Cir. 2005). Indeed, "[d]ismissal of a third-party beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant, or where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52-53 (2d Cir. 2012) (quoting *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005)).

---

restructured deal would have D-Vasive acquire Demonsaw and MGT acquire D-Vasive. Thus, plaintiffs' breach of contract claim against MGT for shares they are owed as a result of both the D-Vasive and Demonsaw acquisitions arises from the as-amended D-Vasive APA." Pl. Memo at 10 n.9 (internal citations omitted).

In *Consolidated Edison, Inc. v. Northeast Utilities*, the Second Circuit considered whether shareholders of the company NU enjoyed the right, as third-party beneficiaries, to sue a company (CEI) that had failed to complete a merger with NU. *See* 426 F.3d at 525-27. The court explained, "The question . . . is whether CEI and NU intended to confer on NU's shareholders a right to enforce CEI's promise to complete the merger . . . . Undoubtedly, the merger agreement confers on NU's shareholders certain rights as third-party beneficiaries, so that after the . . . merger was to be complete, the shareholders could have enforced CEI's contractual obligation to pay them . . . ." *Id.* at 527. The court then turned to examine the contract at issue. The agreement between CEI and NU stated that it was "not intended to confer upon any person other than the parties any rights or remedies," with a few exceptions. *Id.* at 528. Relevant here, the provision excepted a section of the agreement that stated that at the time the merger was to be complete, each NU share would be converted into the right to receive cash or stock in the post-merger company. *Id.* As the court interpreted that provision, "the parties to the Agreement clearly created a third-party right, but just as clearly they took pains to assure that the right was limited to a right to collect the shareholder premium if and when the merger happened, not a right to sue to compel completion of the merger or for damages resulting from a party's refusal to merge." *Id.* The court explained that "the only third-party right conferred on NU's shareholders is a right, arising *upon completion of the merger*, to receive payment for their shares." *Id.* (emphasis in original). Because the merger was never completed, "that right never arose." *Id.*

By contrast, in *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Management LLC*, the Second Circuit held that the contract at issue there plausibly evinced an intent to allow

enforcement of the contract by third-party Noteholders. The agreement stated, "This Agreement is made solely for the benefit of the [parties to the contract], their successors and assigns, and no other person shall have any right, benefit or interest under or because of this Agreement, except as otherwise specifically provided herein. The Swap Counterparty shall be an intended third party beneficiary of this Agreement." 692 F.3d at 53. The court concluded that this language did not unambiguously exclude an intent to benefit the Noteholders because (1) the "herein" in "except as otherwise specifically provided herein" could apply to the entire agreement, not just that section, and (2) the provision identified Swap Counterparty as *an* intended third-party beneficiary but contained no limitation regarding other possible third-party beneficiaries. *Id.* at 53-54. The court thus looked at the contract as a whole, which included a provision that established that one of the parties' obligations under the agreement "shall be enforceable at the insistence of each Issuer, the Trustee on behalf of the holders of the relevant Notes, or the requisite percentage of holders of the relevant Notes on behalf of themselves." *Id.* at 54. Accordingly, the court concluded that the contract as a whole "plausibly demonstrate[d] an intent to benefit the Noteholders." *Id.* at 55.

The D-Vasive APA is most similar to the contract at issue in *Consolidated Edison*. Like the contract there, the contract at issue here does not evidence an intent to let Plaintiffs sue for breach of contract, though it may give Plaintiffs a right to sue to enforce the APA once the acquisition is completed. The D-Vasive APA's "No Third Party Beneficiaries" provision states,

> This Agreement and the Collateral Agreements are solely for the benefits of the Parties and, only to the extent provided in Article VII hereof, their respective Affiliates and employees, representatives, agents, directors, officers, partners or principals, as applicable, or their respective assigns, for whom the parties shall be entitled to enforce this Agreement, and *no provision of this Agreement shall be deemed to confer upon any other Third Parties any remedy, claim, liability,*

*reimbursement, cause of action or other right; provided however, [MGT] understand[s] and agree[s] that D-Vasive's designees shall have a right to receive the Common Shares constituting the Purchase Price.* Within 90 days of closing, D-Vasive shall provide [MGT] with written notice of the intended recipients of the shares of Common Stock and [MGT] shall use its best commercial efforts to honor such transfer request, . . . and [D-Vasive] shall have the right to enforce such transfer request.

D-Vasive APA § 8.11 (emphasis added).[3] The APA provides that, as part of the "Purchase Price," MGT shall issue to D-Vasive or its designees, the noteholders, shares of Common Stock. D-Vasive APA § 2.4; Amendment to D-Vasive APA § 1(c)-(d); *see also* Amendment to D-Vasive APA, Annex A (showing the allocation of "Purchase Price" shares, including 10,000,000 closing shares to Demonsaw noteholders and 8,800,000 closing shares to D-Vasive noteholders). But the APA also states that MGT shall provide the Purchase Price "in consideration for the sale, transfer, assignment, conveyance and delivery by D-Vasive to [MGT] of the Assets and [D-Vasive's] agreement to retain and satisfy" liabilities. D-Vasive APA § 2.4. Moreover, the APA states that "*[a]t the Closing*," MGT shall deliver to D-Vasive the Purchase Price. D-Vasive APA § 3.3(b)(iii)-(v) (emphasis added). Read together, the APA provisions establish that "the only third-party right conferred on [Plaintiffs] is a right, arising *upon completion of the [acquisition]*, to receive payment." *Consolidated Edison, Inc.*, 426 F.3d at 528. As in *Consolidated Edison*, "that right never arose" because the acquisition was never completed.

Unlike in *Bayerische Landesbank*, the D-Vasive APA does not contain an ambiguous carve-out like "except as otherwise specifically provided herein" to the general prohibition

---

[3] Although the D-Vasive APA was amended to account for the D-Vasive acquisition of Demonsaw, the amended APA does not alter the "No Third Party Beneficiaries" provision of the D-Vasive APA. *See* Amendment to D-Vasive APA.

against third-party beneficiaries. *Cf. Bayerische Landesbank*, 692 F.3d at 53-54. Likewise, the APA contains no comparable provision establishing that MGT's obligations "shall be enforceable at the insistence of [Plaintiffs]." Instead, the APA establishes that Plaintiffs shall have a right to receive their portion of the Purchase Price. However, as explained above, MGT was only obligated to provide the Purchase Price in exchange for D-Vasive's assets, the transfer of which did not occur.

Plaintiffs may not bring a breach of contract claim as third-party beneficiaries, so the breach of contract claim is dismissed. Because the Court concludes that Plaintiffs may not pursue a third-party beneficiary claim against Defendants, it does not consider whether MGT breached the underlying contract.

## V.    UNJUST ENRICHMENT

Plaintiffs allege that they "have expended considerable time and money in facilitating the transformation of MGT from an obscure online gaming start-up to an emerging leader in cybersecurity." Complaint at ¶ 68. Plaintiffs claim that "[i]t would be against equity and good conscience for the Defendants to be permitted to retain the benefits which they received at Plaintiffs' expense." Complaint at ¶ 71.

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F. 3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

16

### a. Quasi-Contract Claim

Defendants contend that Plaintiffs' unjust enrichment claim must be dismissed because "the subject matter of the claim is governed by valid contracts." Def. Memo at 20.

The "'theory of unjust enrichment lies as a quasi-contract claim,' and contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'" *Georgia Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009)). "While a plaintiff may generally allege breach of contract and unjust enrichment simultaneously, the 'existence of a valid written contract generally precludes proceeding on grounds of unjust enrichment . . . unless there is a bona fide dispute over the existence of the contract or the contract does not cover the dispute in question.'" *Almazan v. Almazan*, No. 14-cv-311 (AJN), 2015 WL 500176, at *13 (S.D.N.Y. Feb. 4, 2015) (alteration in original) (internal citation omitted) (quoting *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011)).

Here, Plaintiffs allege that they provided a benefit to Defendants—funding for D-Vasive and Demonsaw—expecting to receive compensation in the form of stock once the companies were acquired by MGT. Plaintiffs contend that they only provided the funding because they thought that they would receive compensation for it. *See, e.g.*, Complaint at ¶ 20. However, no contract between Plaintiffs and Defendants setting forth this understanding exists. Instead, the only contracts that exist are (1) agreements between Plaintiffs and D-Vasive/Demonsaw, and (2) contracts between D-Vasive/Demonsaw and MGT, to which Plaintiffs are not third-party beneficiaries. At this point, it is disputed whether the contracts between MGT and D-Vasive/Demonsaw required MGT to acquire D-Vasive/Demonsaw and award Plaintiffs stock in

MGT. If the contracts did so require, then the contracts may govern this action, thereby dooming the unjust enrichment claim. But if the contracts did not require MGT to acquire D-Vasive/Demonsaw under the facts of this case, Plaintiffs may have a claim for unjust enrichment because they provided a benefit to Defendants in exchange for which they expected compensation, and Defendants accepted that benefit but did not provide compensation—nor were they required to provide compensation under the terms of any existing contract. In that case, Plaintiffs may be able to recover under a theory of unjust enrichment. Accordingly, because it is unclear whether the existing contracts "cover the dispute in question," at this stage, the Court declines to dismiss Plaintiffs' unjust enrichment claim based on Defendants' argument that "the subject matter of the claim is governed by valid contracts."

### b. Loss

Defendants also argue that Plaintiffs' unjust enrichment claim fails because Plaintiffs do not allege a cognizable loss. Def. Memo at 21-22.

To succeed on an unjust enrichment claim, Plaintiffs must establish that they suffered a loss. *See State v. Barclays Bank of N.Y.*, 563 N.E.2d 11, 15 (N.Y. 1990).

Read in the light most favorable to the Plaintiffs, the complaint alleges that they suffered a loss. They claim that they provided funds to D-Vasive and Demonsaw but have "not seen a single penny for the money they invested in the transformation of MGT," Complaint at ¶ 50; that they "expended considerable time and money in facilitating the transformation of MGT," Complaint at ¶ 68; and that they have effectively lost "the value of the 13.75 million shares to which [they were] entitled but that Defendants . . . wrongfully retained," Complaint at ¶ 71. Plaintiffs have thus sufficiently alleged a loss.

### c. Statute of Frauds

Defendants further argue that Plaintiffs' unjust enrichment claim is barred by New York's Statute of Frauds. Def. Memo at 22-23.

New York law requires that agreements to compensate someone for "negotiating the purchase [or] sale . . . of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation" be in writing. N.Y. Gen. Oblig. Law § 5-701(a)(10). This requirement applies to claims for unjust enrichment. *See* N.Y. Gen. Oblig. Law § 5-701(a)(10); *Morris Cohon & Co. v. Russell*, 245 N.E.2d 712, 715 (N.Y. 1969).[4]

"'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." N.Y. Gen. Oblig. Law § 5-701(a)(10). "Negotiating a business opportunity includes providing services 'such as: (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential business partners; (3) and being a major contributor to the eventual formation of the [business opportunity].'" *Transition Invs., Inc. v. Allen O. Dragge, Jr. Family Trust*, No. 11 Civ. 4775(PAC), 2011 WL 5865149, at *8 (S.D.N.Y. Nov. 21, 2011) (alteration in original) (quoting *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010)). The Statute of Frauds thus applies when "[t]he essence of plaintiff's claim is that he devoted years of work to finding a business to

---

[4] *Morris Cohon & Co. v. Russell* specifically discusses quantum meruit claims, but quantum meruit and unjust enrichment claims are not separate causes of action. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

acquire and causing an acquisition to take place" and that he should be compensated for such services. *Snyder v. Bronfman*, 921 N.E.2d 567, 569 (N.Y. 2009).

Here, when the complaint is read in the light most favorable to them, Plaintiffs do not seek compensation for "negotiating" the purchase of a business opportunity. Instead, Plaintiffs contend that Defendants have been unjustly enriched by the funds that Plaintiffs provided to D-Vasive and Demonsaw, financing that they offered with the understanding that they would eventually receive MGT stock in return. The essence of that claim is a loan agreement, rather than an agreement to compensate Plaintiffs for "finding a business to acquire," *Snyder*, 921 N.E.2d at 569, or "identifying and analyzing [a] business opportunity . . . [and] business partners," *Transition Invs., Inc.*, 2011 WL 5865149, at *8. To the extent that Plaintiffs' unjust enrichment claim is based on the efforts they exerted in identifying D-Vasive and Demonsaw as potential businesses to acquire, the Court agrees with Defendants that, as in *Snyder*, the Statute of Frauds would bar that claim, as there is no writing setting forth Plaintiffs' "employment by [Defendants] to render the alleged services." *Morris Cohon & Co.*, 245 N.E.2d at 715. Nevertheless, the complaint, read in the light most favorable to Plaintiffs, sets forth an unjust enrichment claim for the funding that Plaintiffs provided to D-Vasive and Demonsaw. Accordingly, Plaintiffs' unjust enrichment claim is not barred by the Statute of Frauds.

## VI.    CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Finally, Defendants contend that Plaintiffs' tortious interference and unjust enrichment claims should be dismissed against the individual defendants. Def. Memo at 23-24.

As explained above, the Court grants the motion to dismiss Plaintiffs' tortious interference with contractual relations claim against all Defendants.

As to the unjust enrichment claim, Defendants argue that the complaint fails to allege that Defendants Bushnell, Holmes, or Onghai were enriched. Def. Memo at 24. But the complaint alleges that "[t]he Individual Defendants also benefited from Plaintiffs' efforts, as each was a shareholder of MGT at the time MGT's stock price skyrocketed. Not only did they benefit from an increase in the value of their MGT stock, but also they benefited from wrongfully retaining the 13.75 million shares to which Plaintiffs were entitled, thus keeping their equity in MGT undiluted." Complaint at ¶ 70. Plaintiffs have thus alleged that the individual defendants benefited at Plaintiffs' expense, as necessary to support an unjust enrichment claim.

## VII. CONCLUSION

Defendants' motion to dismiss Plaintiffs' original complaint, Dkt. No. 47, is denied as moot. Defendants' motion to dismiss Plaintiffs' amended complaint, Dkt. No. 57, is granted as to Plaintiffs' tortious interference with contract and third-party beneficiary breach of contract claims but denied as to Plaintiffs' unjust enrichment claim. This resolves Docket Numbers 47 and 57. The Court hereby schedules an initial pretrial conference for April 27, 2018, at 4:00pm. The materials described at Docket Number 42 shall be due seven days before the conference.

SO ORDERED.

Dated: March 19, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge

21